## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAROLYN ST. CLAIR-HIBBARD, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> AMERICAN FINANCE TRUST, INC., AMERICAN FINANCE ADVISORS, LLC, AR GLOBAL INVESTMENTS, LLC, NICHOLAS S. SCHORSCH and WILLIAM M. KAHANE, <br><br> Defendants. | Civil Action No.: <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14 AND 20 OF THE SECURITIES EXCHANGE ACT OF 1934 AND BREACH OF FIDUCIARY DUTIES** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff, Carolyn St. Clair-Hibbard ("Plaintiff"), by her undersigned attorneys, alleges upon personal knowledge with respect to herself and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein as follows:

### NATURE OF THE ACTION

1.    This action is brought as a class action by Plaintiff on behalf of herself and all other holders of common stock of American Finance Trust, Inc. ("AFIN" or the "Company") against the Company and its controlling persons, Defendants AR Global Investments, LLC ("AR Global"), American Finance Advisors, Inc. ("Advisor"), Nicholas S. Schorsch ("Schorsch") and William D. Kahane ("Kahane"), for their violations of Section 14(a) and 20(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), 4(a) in connection with the issuance of materially defective proxy materials which resulted in the approval of a new Advisory Agreement (the "3rd Advisory Agreement") between the Company and the Advisor which appropriated value from Plaintiff and shareholders and enriched the Advisor and other

1

Defendants (except AFIN) unfairly, illegally, and inequitably as detailed herein, as part of the

merger between AFIN and another AR Global affiliate, Retail Centers of America ("RCA") (the

"Merger").

2.      Beginning in December, 2016 and through February 9, 2017, in order to convince

AFIN shareholders to vote in favor of the Merger and approval of the Third Amended And

Restated Advisory Agreement ("3rd Advisory Agreement"), AFIN and other Defendants drafted,

filed with the SEC, and issued publicly and directly to AFIN shareholders materially incomplete

and misleading proxy materials (the "Proxy Materials") in violation of Sections 14(a) and 20(a)

and (b) of the Exchange Act and SEC Rule 14a-9 (17 C.F.R. 240.14a-9) thereunder.

3.      In the same Proxy Materials where AFIN was recommending that shareholders

vote to approve the merger and 3rd Advisory Agreement, Defendants failed to disclose certain

material information that was necessary for shareholders to properly assess whether the merger

and 3rd Advisory Agreement were in the best interests of the AFIN shareholders.  The non-

disclosures of such information rendered the statements in the Proxy Materials materially false

and misleading.

4.      In particular, the proxy materials contained materially incomplete and misleading

information concerning:  (a) AR Global's plan to roll up all of its affiliated non-traded public

REITs into AFIN and another AR Global affiliate in order to make all such other REITs subject

to a 20 year non-cancellable Advisory Agreement and thereafter at AFIN subject to the 3rd

Advisory Agreement; (b) the financial impact of the changes in the 3rd Advisory Agreement

upon AFIN and its shareholders; (c) the material negative impact upon AFIN and its

shareholders for a public listing liquidity event resulting from the 3rd Advisory Agreement and

AFIN's engagement of external management; (d) the abandonment of AFIN "objectives"

previously promised to AFIN shareholders; (e) the imminent termination of AFIN's repurchase program – the only chance for liquidity for AFIN shareholders; and (f) the negative impact of the 3rd Advisory Agreement on AFIN's financial condition and ability to sustain the dividend.

5.      The actions of the Advisor, controlled by AR Global, Schorsch and Kahane, as described herein, constitute breaches of the fiduciary duties undertaken directly to AFIN shareholders by Advisor, expressly, in all iterations of the Advisory Agreements.  All of the actions described herein to amend the Advisory Agreements were all done with the intent to, and had the effect of, enriching Advisor, AR Global, Schorsch and Kahane, at the expense of AFIN shareholders and deprived them of the opportunity for liquidity of their shares of AFIN stock. Accordingly, AFIN stockholders are stuck in their AFIN stock whose liquidity window was slammed shut and whose dividend was slashed shortly after approval of the 3rd Advisory Agreement.

6.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) and 20(b) of the Exchange Act, based on Defendants' violation of Rule 14a-9 (17 C.F.R. 240.14a-9) and seeks damages and/or voiding and rescission of the 3rd Advisory Agreement.  In addition, Plaintiff seeks to recover damages resulting from the Advisor's fiduciary breaches and AR Global, Kahane's and Schorsch aiding and abetting thereof (directly and/or aiding and abetting thereof) and/or to rescind the amendments of the Advisory Agreement implemented in 2015 ("2nd Amended Agreement) and 2017 ("3rd Amended Agreement").

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges

violation of Section 14(a) and 20(a) of the Exchange Act.  In addition, the Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the state law claims.

8.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Defendants are residents of the city and state of New York.

### THE PARTIES

#### A. Plaintiff

9.      Carolyn St. Clair-Hibbard ("St. Clair-Hibbard"), an Oregon resident, is and has been a shareholder of AFIN since at least 2015 through the present.

10.      Plaintiff is a shareholder of American Finance Trust, Inc. ("AFIN") a non-publicly traded REIT company controlled and operated by Advisor which in turn is owned, operated and controlled by AR Global, Kahane and Schorsch, majority owners of AR Global and Advisor who have been implicated directly and indirectly in the financial fraud at American Realty Capital Partners ("ARCP") which caused its collapse and losses of hundreds of millions of dollars of shareholder monies.  The same group that was behind that fraud has been systematically siphoning the value and assets of AFIN from shareholders and appropriating for themselves the value of AFIN to the detriment of AFIN's shareholders.

11.      Since AFIN has refused to list its stock on either the NYSE or NASDAQ despite securing listings approvals on both and because AFIN has terminated its repurchase program, there is no liquidity for the shareholders.  As a result, AFIN shareholders are trapped in AFIN which has just cut its dividend.  Thus, this lawsuit is the only viable option for AFIN shareholders to recover damages and for equitable relief:  they can't sell their investment because AFIN refuses to list the stock and refuses to redeem or buy back shares.

**B. Defendants**

12.     Defendant AFIN is a publicly registered, non-traded real estate investment trust formerly known as American Realty Capital Trust V, Inc.  It is externally managed.  It is incorporated in Maryland and its principal executive offices are located at 405 Park Avenue, 14th Floor, New York, New York 10022.  AFIN invests in single-tenant commercial properties that are net leased to investment grade and creditworthy tenants.  AFIN has no employees and even its executive officers are employees of Advisors (directly) and AR Global (indirectly) upon whom AFIN relies for all of its operational, managerial and financial activities, and who thereby control AFIN.

13.     Since its formation AFIN has an advisory contract with Defendant American Finance Advisors, LLC successor to American Realty Capital Advisors V, LLC now known as American Finance Advisors, LLC ("Advisor"), an indirect wholly owned subsidiary controlled by Defendant AR Global Investments, LLC ("AR Global"), Kahane and Schorsch.

14.     AFIN is one of the REIT industry's rare externally managed REITs.  As external manager of AFIN, Advisor was and is responsible for AFIN's affairs on a day-to-day basis.  Pursuant to the terms of the AFIN's agreement with Advisor, Advisor provided AFIN with its management team, support personnel and resources necessary to implement and execute AFIN's business and growth strategies.  According to SEC filings (AFIN Form S-11 filed April 2013 at 3 ("S-11")), the Advisor's responsibilities include *inter alia*:  "managing our affairs on a day to day basis," "financial reporting," "regulatory compliance," investor relations" and "other administrative function," and "prepare and review on our behalf . . . . all reports and returns required by the SEC . . ." (S-11 at 87).  Conspicuously absent from the list of matters requiring approval of AFIN directors is SEC filings for mergers or proxies or shareholder voting.  (S-11 at

111). By contrast, AFIN described the role of its Board of Directors <u>solely</u> as: "responsible for reviewing the performance of our advisor and must approve certain other matters set forth in our charter." Accordingly, Advisors, AR Global, Kahane and Schorsch have complete operational control of AFIN since its formation, including control of the defective proxy materials which are the subject of this action.

15.     Defendant AR Global Investments, LLC ("AR Global) is the sponsor and manager of non-traded REITs including AFIN and other Schorsch-controlled REITs including Retail Centers of America ("RCA"). RCA was merged into AFIN in February 2017 (the "Merger") after a narrow vote of approval (50.9%) by AFIN shareholders induced by the materially defective Proxy Materials. AR Global is a Delaware limited liability company with its principal place of business in New York. AR Global has been publicly held out by its principals as: "the successor to," and is functionally identical to, AR Capital, LLC ("ARC"). AR Global is the parent company of Defendant American Finance Advisors, LLC.

16.     Defendant American Finance Advisors, LLC, ("Advisor"), a wholly owned indirect subsidiary of AR Global, provides advisory services to AFIN, pursuant to an Advisory Agreement dated April 1, 2013 and later amended in mid-2015 and amended again (3rd Advisory Agreement) as part of the Merger Vote. Advisor has been, and is being, unjustly enriched at AFIN's expense. It is a Delaware limited liability company with its principal place of business in New York, New York.

17.     Advisor is the vehicle through which AR Global controlled AFIN. In turn, Defendants Schorsch and Kahane controlled AR Global.

18.     Defendant Nicholas S. Schorsch ("Schorsch") is the Chairman, Chief Executive Officer and controlling owner of AR Global through his 56.02% ownership of the equity. His

6

wife Shelly D. Schorsch, owns an additional 7.54% of AR Global. That company in turn owns 100% of the Advisor. Schorsch dominance and control was demonstrated by the testimony of Lisa McAlister, former chief account officer at the Schorsch controlled REIT, American Realty Capital Properties, Inc. Ms. McAlister testified at the fraud criminal trial in the Southern District of New York of Brian Block, former Chief Financial Officer of AR Global affiliate, American Realty Capital Partners ("ARCP") that Schorsch orchestrated the financial fraud. *See U.S. v. Block*, No. 16-CRIM-595 (S.D.N.Y.) Ms. McAlister testified that Schorsch was "very demanding" in his management style. "He's a bully, just an overall bully," she testified. She testified that to Schorsch "Every hundredth of a penny was important . . .". Brian Block was convicted of fraud in 2017 in that trial.

19.     Schorsch and Kahane were in control of all aspects of AR Global's operations and its affiliates including the Defendants named herein. Schorsch's and Kahane's control and dominance of AR Global and affiliates was evidenced by the actions of Advisor which acted for the benefit of AR Global even though pursuant to the terms of Advisory Agreement it was a fiduciary of both AFIN and its stockholders.

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action pursuant to Fed. R. Civ. P. 23b(1), b(2) and b(3) on behalf of herself and the other public shareholders of AFIN (the "Class"). Excluded from the Class are Defendants herein and any person, firm trust, corporation, or other entity related to or affiliated with any Defendant.

21.     This action is properly maintainable as a class action because:

(a)     The Class is numerous that joinder of all members is impracticable. As of October 2017, there were approximately 104.8 million shares of AFIN common stock

outstanding, held by hundreds of individuals and entities scattered through the country. The actual number of public shareholders of AFIN will be ascertained through discovery;

(b)     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including but not limited to the following:

(i)     whether the Proxy Materials failed to disclose material information regarding, *inter alia*, the financial effects of the merger and 3rd Advisory Agreement on AFIN shareholders and AFIN and its potential NYSE listing;

(i)     whether Defendants have misrepresented, and concealed their *inter alia*, plan to use the Advisor to misappropriate value from AFIN shareholders to AR Global and Advisor;

(ii)    whether the Adviser has violated Section 20(a) and (b) of the Exchange Act;

(iii)   whether Defendant AR Global has violated Section 20(a) and (b) of the Exchange Act;

(iv)    whether Defendants Schorsch and Kahane have violated Section 20(a) and (b); and

(v)     whether Defendant Advisor has violated the fiduciary duties to stockholders it undertook in the Advisory Agreements and whether the other Defendants (except AFIN) aided and abetted the fiduciary breaches.

(c)     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interest of the Class;

(d)     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e)     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

(f)     Defendants have acted on grounds generally applicable to the class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

(g)     A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

**A.     AFIN Was Started And Has Remained An Externally
Managed Non Publicly Traded REIT
Despite The Deleterious Effect On AFIN's Shareholders**

22.     AFIN was organized on January 22, 2013 as American Realty Capital Trust V, Inc., one of 12 publicly offered non-traded REITs sponsored by the Nicholas Schorsch owned and controlled American Realty Capital group of companies.  The other eleven non-traded REITs are:

(i)     American Realty Capital New York Recovery REIT, Inc. ("NYRR");

(ii)    Philips Edison – ARC Shopping Center REIT,
        Inc.|
        ("PE-ARC");

(iii)   American Realty Capital – Retail Centers of
        America, Inc.
        ("ARC RCA");

(iv)    American Realty Healthcare Trust, Inc.
        ("ARC-HT");

(v)     American Realty Capital Net Asset Value Trust,
        Inc. ("ARC-DNA");

(vi)    American Realty Capital Global Trust, Inc.
        ("ARC-Global");

(vii)   American Realty Capital Trust IV, Inc.
        ("ARCT IV");

(viii)  American Realty Capital Healthcare Trust III, Inc.
        (ARC HT III");

(ix)    ARC Realty Finance Trust, Inc.
        ("ARC RFT");

(x)     Phillip Edison – ARC Grocery Center REIT II,
        Inc.
        ("PE-ARC II"); and

(xi)    American Realty Capital Hospitality Trust, Inc.
        ("ARC – HOST").

Of the eleven REITs listed above, numbers (iii); (iv); (vi); (vii); (viii) and (ix) have been merged

into either AFIN or Global Net Lease which both have 20 year unbreakable advisory agreements

with 100% wholly owned advisory companies of AR Global.  Those mergers were part of the

plan hatched at AR Global after the fraud scandal at ARCP (*see* ¶¶ __) and disclosed in the press

in 2016 (*see* ¶¶ __). At another number above, (i) NYRR, a self-dealing merger was attempted

by the AR Global but defeated at the ballot box.

23.     In SEC filings from inception through the present, AFIN represented itself a

publicly offered, non-traded REIT sponsored by the American Realty Capital Group of

companies (S-11 at 1), organized on January 22, 2013 to acquire and operate "primarily

freestanding, single tenant retail properties net leased to investment grade and other creditworthy

tenants."  AFIN represented to its shareholders that it was differentiated from other non-traded

REITs by *inter alia* "our institutional management team."

24.     Among AFIN's publicly disclosed "investment objectives" were *inter alia*:

> "Low leverage" –target leverage level of not more than 45% loan-
> to-value ratio.

> Monthly Distributions – pay distributions monthly covered by
> funds from operations.

> Exit strategy – we expect to sell our assets, sell or merge our
> company, or list our company within three to six years after the
> end of our initial public offering.

25.     AFIN also represented to investors that it had a planned path of liquidity for AFIN

shareholders:

> If we do not begin the process of achieving a liquidity event by the
> sixth anniversary of the termination of the primary offering, our
> charter requires our board of directors to adopt a resolution
> declaring that a plan of liquidation [to be presented to shareholders
> unless the board decides otherwise].

26.     As of the present, as more fully detailed herein, due to AR Global's control of

Advisor, none of the foregoing objectives have been achieved, and in fact, have been abandoned,

and AFIN is now saddled with the 40 year non-cancellable 3rd Advisory Agreement which

carries an approximately $125 million internalization fee.

27.     AFIN admitted that the only actual liquidity for its shareholders was AFIN's share

repurchase program which, however, was limited to a maximum of 5% of outstanding shares

every year and to the extent AFIN has "sufficient liquid assets." (S-11 at 31). It was later terminated.

28.    In the S-3, AFIN also patted itself on the back for not having "internalization" burdens and warned of the dangers thereof (S-11 2013 at 30):

> Historically, due to the apparent preference of the public markets for self-managed companies, non-traded REITs have engaged in internalization transactions (an acquisition of management functions by the REIT form its advisor) pursuant to which they became self-managed prior to listing their securities on national securities exchanges. These internalization transactions can result in significant payments to affiliates of the advisor irrespective of the returns stockholders have received. Our charter and advisory agreement provide that no compensation with any internalization transaction (an acquisition of management functions by us from our advisor) in the future. [Emphasis supplied].

29.    At the time of the S-11, AFIN had a one year advisory agreement with Advisor ending June 5, 2014 which was renewable for an unlimited number of successive one year periods. Either party could terminate the advisory agreement without cause or penalty upon 60 day written notice. Upon termination or non-renewal, Advisor, was entitled to receive a non-renewal fee from AFIN only if the sum of AFIN market value plus distribution exceeded the sum of the aggregate capital contributed by investors plus a 6% cumulative return to investors. As of the time of the S-11, upon non-renewal, Advisor would not have been entitled to any fee under this provision.

30.    As of September 19, 2013, neither AFIN's charter nor the Advisory Agreement allowed any fees for "internalization transactions" in the event AFIN would take over any functions from the Advisor.

31.    AFIN's external management structure is an anomaly in the US REIT industry: only 13% of REITs are externally managed, comprising only 3% of the industry's market cap.

32.     According to an Ernst & Young ("E&Y") study conducted in 2017 utilizing the "SNL" financial database, internally managed REITs have outperformed externally managed peers by approximately 240 bps per year over the last 5 years.

33.     Industry expert, Green Street Advisors, has publicly corroborated E&Y findings that externally managed REITs are valued for far less than internally managed REITs.  Phil Owens, a Senior Vice President at Green Street Advisors, in an interview at "REIT Week 2016: NAREIT's Investor Forum" noted that externally managed REITs trade at "massive discount" to internally managed peers.  In none of the Proxy Materials did Defendants ever disclose or warn of the value-destruction inherent in an externally managed REIT, let alone one like AFIN where the external manager had a 40 year non-cancellable contract and a $125 internalization penalty.

34.     In the industry, it is generally agreed that once a non-publicly traded REIT acquires a billion dollars in assets it is large enough to realize substantial savings by converting from external management to internal management.  AFIN had in excess of $1 billion in assets and its merger with RCA increased assets by at least one billion dollars.  Accordingly, it was well positioned to be self-managed.

35.     The foregoing industry awareness of the disadvantages of externally managed REITs was recognized as far back as 2007 as evidenced by a November 2007 Moody's Corporate Governance paper, titled:  "Corporate Governance of Externally Managed REITs Presents Credit Risk."  In it summary, the Report noted the risk, (which at AFIN has been actualized):

> [E]xternal structures can create governance risks (at least when compared to REITs that are internally managed and these governance risks can translate into credit risks.  The central governance risk is that the external manager uses its control to extract value from the REIT to the detriment of shareholders and bondholders.  [Emphasis supplied].

36.     Moody's also warned:

> The external management structure provides managers with
> significant influence over corporate decision-making and strategic
> direction, and as a result considerable control over the REIT's
> operations.

*     *     *

> Often, however, the external manager is given representation on
> the REIT's board.  Such representation greatly limits the board's
> independence and provides the manager with yet more influence
> over the REIT's strategic and financial direction – partly as a result
> of having inside knowledge of the organization's day-to-day
> operations, and partly through the opportunity to steer board
> agendas.  This is particularly a concern if one of the manager's
> representatives also serves as chairman.  In situations where boards
> are relatively small, independent directors face an even greater
> challenge because they often comprise a small proportion of the
> directors, and the group dynamics can favor the manager's
> representatives . . .

37.     Defendants (other than AFIN) previously admitted how external management of

REITs destroyed the value of shareholders stock and undermined a potential public listing.

American Realty Capital Partner (owned and controlled by AR Global, Schorsch and Kahane)

issued a press release on August 20, 2013 announcing:

> "The Board of Directors has determined that it is in the best
> interests of the Company [ARCP] and its stockholders to become
> self-managed."

*     *     *

> The decision to undertake this important action is motivated by the
> Board's continuing desire to enhance stockholder value.

*     *     *

> The Company recognized that institutional investors, research
> analysts and the financial press have historically viewed externally
> managed REITs as being susceptible to potential conflicts of
> interest, which may contribute to externally managed publicly

14

> listed REITs trading at lower earnings multiples relative to self-
> managed REITs.  For example, high quality, large self-managed
> net lease REITs currently trade at multiples of 17x to 18x FFO
> while [ARCP] trades at 15x FFO.  ARCP believes that potential
> multiple expansion as a result of becoming self-managed may
> increase the Company's delivery of stockholder value to its
> stockholders.  [Emphasis supplied].

38.    Consistent with its August 13, 2013 announcement, ARCP terminated its external

manager relationship with AR Capital and in January 2014 became self-managed.  ARCP was

not required to pay an internalization fee.

39.    The conflicts of interest inherent in externally managed REITs are so obvious that

the SEC issued an "Investor Bulletin: Non Traded REITs," August 31, 2015 which warned:

> Conflicts of Interest.  Non-traded REITs are typically externally
> managed – meaning that REITs do not have their own employees.
> As noted above, the external manager may be paid significant
> transaction fees by the REIT for services that may not necessarily
> align with the interests of shareholders, such as fees based on the
> amount of property acquisitions and assets under management.  In
> addition, the external manager may manage or be affiliated with
> competing REITs.

40.    In its Form S-11 dated September 19, 2013 AFIN admits there are "substantial

conflicts of among, the interests of our investors, our interests and the interests of our advisor,

sponsor . . . which could result in decisions that are not in the best interests of our stockholders."

The S-11 admits that its advisor's interests are not "wholly aligned" with AFIN's stockholders

because, *inter alia*, advisor and affiliates receive fees from AFIN and "substantial minimum

compensation regardless of performance."  Beginning at page 100 of the S-11, AFIN list 11

pages of conflicts arising out of AFIN's relationship with the adviser and its affiliates.  AFIN

admits that its directors "face conflicts of interests related to positions they hold with affiliated

entities" and admits management of multiple REITs sponsored by AR Global will cause conflicts

of interest.  In the S-11, AFIN admits "every transaction we enter into with our advisor or its

affiliates will be subject to an inherent conflict of interest.  Our board of directors may encounter conflicts of interest . . . in invoking powers, rights or options pursuant to any agreement between us and our advisor or any of its affiliates."  Specifically, AFIN admitted that its officers and directors have conflicts of interest "related to the positions they hold with affiliated entities." AFIN represented that:  "conflicts with our business and interests are most likely to arise from involvement in activities related to . . . (f) compensation to our advisor . . ." (S-11 at 41). [Emphasis supplied].  While AFIN has formulated "conflict resolution" procedures, none apply to the transactions involving the Advisory Agreement.

41.     The failure to address, ameliorate or avoid those conflicts was, under New York law, a breach of the fiduciary duties owed by Advisory to the AFIN stockholders as explicitly undertaken under all versions of the Advisory Agreements, including the 3rd Advisory Agreement:  "The Advisor, as a result of its relationship with the Company and the Operating Partnership pursuant to this Agreement, has a fiduciary responsibility and duty to the Company, the Stockholders and the partners in the Operating Partnership."  Amended and Restated Advisory Agreement at page 12.  [Emphasis supplied].  That fiduciary undertaking was included in every iteration of the Advisory Agreement including the 3rd Amended Advisory Agreement.

42.     There was no effective check on these conflicts because not one member of AFIN's Board of Directors was ever "independent" of AR Global under the NASAA REIT Guidelines "Statement of Policy Regarding Real Estate Investment Trusts" as Sections I B.14 and Section II B.3.  Moreover, AFIN and Advisor shared a legal counsel, Proskauer Rose, LLP.

**B.** **As AR Global's Original Business Model Started To Fail, Defendants Kahane and Schorsch Began To Replace AR Global's Lost Revenues With Onerous Advisory Agreements Terms Imposed On Affiliated REITs And, Eventually, AFIN**

43.     AR Global purportedly has over $18 billion of real estate loans under management. AR Global operates its business through a complex web of subsidiaries. Generally, for each REIT or other investment vehicle it sponsors, such as AFIN. AR Global maintains a number of wholly owned entities. While the nature and function of these entities varies from vehicle to vehicle, for every AR Global fund a separate entity is created to provide management services pursuant to an advisory agreement. As explained in detail below, while the terms of these advisory agreements vary, they are invariably lucrative to the advisor entities, which have no employees and provide the required services entirely through employees of AR Global and related entities.

44.     Defendant Schorsch and Kahane used AR Global as the umbrella company for all their companies that were not REITs which did business with the REITs. AR Global, through subsidiaries and affiliates, through an onerous and unfair "Advisory Agreement" charged AFIN "advisory" and others fees which were unfair and above market and which were made non-cancellable.

45.     AR Capital, before it was succeeded by AR Global, created investment vehicles, typically by purchasing hard assets such as real estate, which are placed into a tax advantaged REIT or BDC ("Business Development Company") structure. It then oversees the fund – obtaining debt financing; buying, selling, and managing assets; and ultimately deciding when and how to sell the business, take it public, or wind it down. For these services, provided through a variety of wholly owned "advisor" and "manager" entities AR Capital was richly compensated. This compensation comes in the form of ongoing asset management fees,

typically equal to a percentage of assets under management, or fixed annual fees of similar magnitude; asset acquisition and disposition fees; substantial bonuses upon consummation of a "liquidity event" (such as selling the REIT or taking it public); and various forms of profit sharing sometimes referred to as a "promote." A typical promote might give AR Capital, through its advisor subsidiary, 15% of the REIT's annual profits above 6%.

46.     Thus, Defendant Schorsch's and Kahane's basic business model for AR Global was to sell stock to the public shareholders in his non-traded REITs, skim the issue price for AR Global fees, then saddle the REITs with Advisory Agreements and extract fees from affiliates such as AFIN each year. In the case of AFIN, it raised a total of $2.04 billion in AFIN's offering, thus allowing AR Global to collect more than $100,000,000 in fees for those sales alone!

47.     AR Global's revenue stream was materially adversely affected when, in or about October 29, 2014, the largest company in the AR Global portfolio, the publicly traded American Realty Capital Partners ("ARCP"), disclosed a significant accounting fraud. (That disclosure resulted in indictments of several key officers and the conviction of an executive officer in July 2017). In SEC filings in late 2014-early 2015, ARCP acknowledged that it had been overstating its financial performance since 2011 and that certain payments to Schorsch related entities were "not sufficiently documented." Thereafter, broker-dealers halted sales of investments affiliated with Defendant Schorsch and/or AR Global. Things got progressively worse for AR Global: (i) in November 2015 AR Global had to announce that it had stopped creating and marketing new non-traded REITs (halting another AR Global revenue stream); (ii) in December 2015, Phillips Edison Grocery Center REIT terminated the AR Global advisory agreement; and (iii) in April 2016 United Development Funding Income V also terminated the AR Global advisory

agreement.  In 2015, Schorsch was on the verge of selling a majority stake of AR Global to

Apollo Global Management LLC for $378 million.  Apollo backed out of the deal after an AR

Global controlled affiliate, Realty Capital Securities ("RCS") was caught engaging in a proxy

fraud at another AR Global affiliate, Business Development Corp. of America ("BDCA").

48.     Schorsch, Kahane and AR Global determined to devise a way to prevent other

non-traded AR Global Advised REITs from terminating the lucrative-for-AR Global, unfair-for-

shareholders AR Global advisory and management agreement.  To make up for the decline in

revenues from AR Global's now defunct, scandal-ridden syndication business of non-traded

REITs, AR Global turned to exploiting the non-traded REITs it sponsored and managed.  To do

so, it embarked on a scheme to modify and extend its advisory contracts across its portfolio of

non-traded REITs, in order to make them all externally managed by AR Global under long term

contracts with "internalization fees," the latest of which was the Merger of AFIN and RCA

initiated in 2016 and closed in 2017.

49.     According to an April 26, 2016 *Investment News* article titled "Schorsch's AR

Global looking to consolidate $10.5 billion of REITs," AR Global's plan was for AFIN and

Global Net Lease Inc. (where Kahane was President and CEO) to "purchase five other real estate

companies managed by AR Global…. Mr. Schorsch and William Kahane are the controlling

partners of AR Global, which in turn controls the adviser to each of the seven REITs in the

potential roll ups."  As discussed in the article:

> Through its advisers, AR Global generates fees and incomes by
> acquiring and managing properties on behalf of REITs, said Brad
> Thomas, editor of Forbes Real Estate Investor.  "The investor
> doesn't get paid a fee every time the REIT buys a property, but the
> management does."
>
> The flurry of mergers, if successful, would put more assets under
> the roofs of the two REITs, which have unusual, difficult to break

20-year advisory contracts with AR Global, said industry sources, including former AR Global employees.  AR Global does not have 20-year advisory agreements with the other REITs it manages, observers said.

That means AR Global, as the manager of two larger REITs, would create a larger source of fee revenue over a long period of time, benefitting Mr. Schorsch and his partners, those sources said.

### DEFENDANTS AR GLOBAL, ADVISORS, SCHORSCH AND KAHANE ORCHESTRATED A SERIES OF TRANSACTIONS TO IMPOSE EVERMORE CONFISCATORY ADVISORY AGREEMENT TERMS ON AFIN TO ENRICH THEMSELVES

50.     After the ARCP accounting scandal, Schorsch scrambled to increase and preserve the revenue stream at AR Global.  His plan involved the acquisition of 5 affiliated non-traded REITs by one or the other of AFIN or Global Net LLC.  Both of AFIN and Global Net LLC have 20 year virtually unbreakable agreements with AR Global affiliates for management and advisory services.  The 5 non-traded affiliate REITs did not have 20 year contracts with AR Global.  Thus Schorsch, through AR Global, as successor to AR Capital, schemed to bring those assets under the AR Global/AFIN/Global Net Lease fee structure in an Advisory Agreement.

51.     According to SEC filings, AR Global earned over $80 million from Advisory Agreements with AR Global managed REITs in 2015, including over $20 million paid by RCA and AFIN.  But AR Global was concerned about the security of this revenue stream.  As of mid-2016, only two AR Global's Advisory Agreements had 20 year terms.  Thus, one of the main objectives of AR Global's scheme was to lock in enormous advisor fees for the next 20 years by saddling the non-traded REITs with excessive termination fees to ensure that the REITs, including AFIN, would not terminate the Advisory Agreements and ensure that AR Global could reap a huge windfall if AFIN decide to become self-managed.

52.     AR Global previously inflicted the same scheme on three other of its non-traded REITs:  Realty Finance Trust, Inc., American Realty Capital Healthcare Trust III and Healthcare Trust, Inc.  So rife with conflicts and self-dealing was the Realty Finance Trust merger with an affiliate that one of its directors, Robert Froehlich, resigned after advising his fellow directors of conflicts of interest that precluded fair treatment for Realty Finance Trust holders.  The Global Net Lease merger with American Realty Capital Global Trust II also was driven by AR Global's desire to extend advisory contracts inasmuch as the aforementioned Trust did not have a 20 year advisor agreement but Global Net Lease, with whom it merged, did have a 20 year agreement.

53.     On or about May 25, 2016, New York REIT, Inc. ("NY REIT"), another AR Global controlled REIT, which is publicly traded, rather than liquidating as originally planned, attempted to engineer a merger transaction designed to preserve AR Global's lucrative management fees.  NY REIT was ultimately forced to withdraw that merger proposal based upon vigorous opposition from institutional stockholders, one of whom launched a proxy contest designed to unseat the board of directors.  Unlike AFIN, NY REIT was publicly traded.

C.     **The Evolution Of The AFIN Advisory Agreement**

54.     On April 29, 2015, AFIN's board approved (subject to shareholder approval of charter changes) amendments to the Amended and Restated Advisory Agreement which became the Second Amended and Restated Advisory Agreement.  That version took effect on July 20, 2015 after a shareholder vote.

55.     In connection with its solicitation of votes to change its by-laws and charter and on the eve of an amendment to the Advisory Agreement that would lock AFIN into a non-cancellable 20 year management agreement for Advisor, AFIN was caused by Advisor, AR Global, Schorsch and Kahane to issue a press release announcing:  (a) a name change to

21

"American Finance Trust, Inc."; (b) an application for NYSE listing of its common stock; and (c) the Company's anticipating of trading of its common stock on the NYSE in the third quarter of 2015.  In the same press release, AFIN admitted the benefits of a NYSE listing for AFIN's shareholders: ". . . increase stockholder value," "providing shareholders an opportunity to participate in future appreciation," "creating additional value of stockholders," "liquidity option available to stockholders in connection with the listing."  However, after the charter changes were approved by stockholders and the Advisory Agreement was amended, AFIN never listed itself on the NYSE and remained a non-publicly traded illiquid REIT.

56.     At or about the same time, AFIN, while Kahane was President and CEO, was planning a shareholder vote to approve changes to the Company's Articles of Amendment and Restatement that would, if approved by shareholders, also trigger changes to the Amended and Restated Advisory Agreement which would result in the "Second Amended And Restated Advisory Agreement."  Among the changes to the Advisory Agreement that enriched Advisor at the expense of AFIN shareholders were:  (a) a change in method of computing and paying Advisor a "Annual Subordinated Performance Fee" from the previous formula based on investment returns to shareholders to a formula based on revenue volume (the latter favored the acquisition of assets rather than the assets' performance); and (b) a flat base management fee of $18 million per year plus a percentage of any equity raised; (c) change of the term of the Advisory Agreement from annul renewals by AFIN to a 20 year term followed by an automatically renewable additional 20 year term, non-cancellable except for "cause" defined at basically including only felonious conduct.

57.     Under the Advisory Agreement, it was in the sole discretion of the Adviser whether it would take its fees in cash or in shares of AFIN.  The Adviser always took its fees in

cash.  Neither Defendants AR Global, nor Schorsch hold any significant amount of AFIN stock and therefore almost no financial stake in AFIN.

58.     On June 1, 2015, Advisor caused AFIN to issue a Notice of Annual Meeting of Stockholders soliciting shareholders votes for approval of charter amendment changes which, AFIN disclosed, would make possible an amendment to the Amended and Restated Advisory Agreement.  That proxy was materially false and misleading because it did not include as an attachment or exhibit, or incorporate by reference the proposed Second Amended and Restated Advisory Agreement.  Moreover, the Proxy failed to disclose:  (a) AR Global's plan to roll up all of its affiliated non-traded public REITs into AFIN in order to make all such other REITs subject to AFIN's 20 year non-cancellable Advisory Agreement and thereafter make all such rolled up REITs subject to the 2nd Advisory Agreement; (b) the financial impact of the changes in the 2nd Advisory Agreement upon AFIN and its shareholders; (c) the material negative impact upon AFIN and its shareholders for a public listing liquidity event resulting from the 2nd Advisory Agreement and AFIN's virtual permanent engagement of external management; and (d) the effective abandonment of AFIN "objectives" previously promised to AFIN shareholders.

59.     During the year ended December 31, 2015, before the amendments to the Advisory Agreement described later herein, AFIN paid AR Global total asset management fees of $13.0 million based mainly upon fees based on asset values.  As a result of the 2017 amendment, now AFIN's payments to AR Global will be over $20 million annually for the fixed portion alone of the base management fee, thus avoiding declines in fees that would result from declines in NAV values.

60.     In the Second Amended and Restated Advisory Agreement dated as of April 29, 2015, the AFIN and Advisor agreed:

> If the Board elects to internalize any management services
> provided by the Advisor, neither the Company nor the Operating
> Partnership shall pay any compensation or other remuneration to
> the Advisor or its affiliates in connection with such internalization.

61.     There was no benefit to AFIN to agree to the 20 year term in the 2nd Advisory

Agreement because nothing obligated Advisor to retain the services of the key personnel relied

upon by AFIN.  Advisor did not have employment agreements with any of its key personnel and

thus AFIN has stated:  "cannot assure you that [Advisor] will be successful in attracting and

retaining "skilled managerial, operational and marketing personnel." (S-11 at 38).  The risk to

AFIN of the departure of Advisors key employees was known, acknowledged and profound as

AFIN stated:

> If [AFIN] terminates the Amended Advisory Agreement certain
> key employees of [AFIN Advisor] may not become employees of
> [AFIN] which could result in [AFIN] incurring costs and
> degradation of its operations.  *Id.*

62.     The actions of Advisor leading to amendment of the Advisory Agreement

including the issuance of false proxy materials resulting in an approval of charter amendments

that triggered the consummation of 2nd Advisory Agreement constituted breach of Advisors

fiduciary duties to AFIN stockholders.

**The Path To The 3rd Advisory Agreement**

63.     In summer 2016, in connection with the proposed merger of RCA ad AFIN, the

Advisor orchestrated the inclusion of modifications to the 2nd Advisor Agreement (which would

become the 3rd Advisory Agreement) in favor of the Advisor and to the detriment of AFIN

shareholders.

64.     On July 6, 2016, in connection with preliminary merger discussions between

AFIN and RCA, Advisor sent a letter to AFIN proposing inclusion in the AFIN Advisory

Agreement of an option on the part of the AFIN Board to elect to internalize in the AFIN

Advisory Agreement as part of the merger agreements.  At the time Advisor had fiduciary duties

to AFIN and its shareholders.  In breach of those duties, Advisors pursued their own interests at

the expense of AFIN and its shareholders and threatened to hold up the RCA-AFIN merger.

65.    Advisor also proposed an increase in the base management fee effective upon

closing of the RCA merger, with the amount of the increase being fixed at $6 million in the first

year after the closing; $7 million in the second year; and $8 million in and after the third year.

66.    AFIN's conflicted board approved the foregoing proposed 3rd Advisory

Agreement despite failing to receive any adequate consideration in return for the concessions

that imposed a  huge cost to AFIN and its shareholders and without any fairness opinion or other

financial advice or input into the financial effects of the proposed 3rd Amended Agreement on

AFIN's potential public listing, the maintenance of its dividend, or the value of AFIN stock.

67.    The AFIN Advisory Agreement was amended as part of the Merger to include a

"right" by AFIN to internalize the services provided under the AFIN Advisory Agreement after

January 1, 2018 with payment of a specified "internalization fee" that has been estimated by

public analysts to cost AFIN over $125 million dollars under the applicable formula.  The

amendment also including the following:

- A fixed portion of the base management fee which increases by
  50% from $18 million per merger to $21 million in its first year
  (after the merger) to $24 million annually in the beginning of
  the third year following the merger;

- A variable portion based on the amount of consideration paid
  for acquisitions which will increase the base management fee;

- A variable portion based on the amount of any equity raised
  after a public listing;

- A variable management fee equal to 15% of quarterly "Core Earnings Per Adjusted Share" over $.375 plus 10% of quarterly "Core Earnings Per Share" over $.50;

- The Internalization fee.

68.     AFIN can only terminate the AFIN Advisory Agreement for "cause" <u>unless</u> AFIN pays a penalty referred to as an "internalization fee."  The only purported justification for the amendment of the AFIN Advisory Agreement was "a reduction in the base management fee and the right of AFIN to terminate the agreement upon payment of the "internalization fee."

69.     To terminate the Amended Advisory Agreement will now require unanimous vote in favor of internalization by designated "independent directors" and one year advance notice of the effective date of internalization.  "Internalization" *i.e.* ending the Advisory Agreement will cost AFIN over $125 million <u>but</u> if AFIN seeks internalization prior to a takeover by an outside company then the acquirer will have to pay the AFIN Advisor fees that would have been payable to the Advisory for one year after the transaction as if there had been no termination.  Thus, even if AR Global is terminated it can continue to siphon off assets from AFIN for one year after a merger.  AFIN will also be required to pay $15 million dollars to AR Global for unspecified "technology assets."

70.     The estimated $125 million internalization fee penalty for terminating the AFIN Advisory Agreement constitutes approximately 5-6 times AFIN's annual average "operating income" for the last 4 years and constitutes over 10% of the AFIN's pre-merger stockholders equity and approximately 7-8% post-merger.  Advisors negotiation for improved terms of its advisory agreements with AFIN constitutes a breach of the fiduciary duties it owed to AFIN shareholders.  In that effort, it was aided and abetted by AR Global, Kahane and Schorsch.

71.     Shareholder approval of the merger which would trigger consummation of the 3rd

Advisory Amendment was procured through materially false and misleading Proxy Materials.

The "Proxy Materials" include:

- Joint Proxy Statements Prospectus filed December 16, 2016;

- Forms 425 filed December 19, 20, 23, 28, 2016;

- Forms 425 filed January 6, 10, 13, 19, 24;

- Forms 425 filed February 1, 2, 3, and 9.

All of the foregoing Form 425s were filed by AFIN pursuant to Rule 425 of the Section Act of

1933 and deemed filed pursuant to Rule 14a-12 under the Securities Exchange Act of 1934.

72.     In the Proxy Materials, the stated reasons for the merger from AFIN point of view

included that: "the amendment of the AFIN Advisory Agreement provides a path to

internalization of services and termination of the AFIN Advisory Agreement."  But AFIN's

proxy statement failed to disclose to shareholders what the cost of internalization to AFIN could

or would be under the Advisory Agreement and what the affect on a potential public listing

would be.

73.     The Proxy Materials misleadingly AFIN's board purportedly based its

recommendation and approval of the merger on, *inter alia*, the possibility of:

> A revised management agreement that creates a fee structure with
> a lower base management fee as a percentage of combined assets
> and costs efficiencies from G&A synergies, which further
> contribute to stronger dividend coverage[1] and enhanced liquidity
> and operating flexibility.

74.     The Proxy Materials omitted any disclosure of any information regarding the

effects on AFIN's public listing or value of its shares from the internalization fee; or the costs of

---

[1]     Shortly after the merger closed AFIN slashed its dividend.

27

the new 20 year management agreement or its non-cancellable terms and automatic 20 year renewal.

75.    The final set of Proxy Materials filed by AFIN on February 9, 2017 once again made the representation:

> AFIN has received authorization from the New York Stock Exchange ("NYSE") . . . to list the AFIN common stock on the NYSE subject to AFIN being in compliance with all applicable listing standards on the date it begins trading on the exchange . . . while AFIN intends to list the AFIN common stock subsequent to the closing of the merger at a time to be determined by the AFIN Board, there can be no assurance as to when or if AFIN common stock will commence trading on the exchange.

76.    In sum, Proxy Material violates Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading. As the Proxy Prospectus contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) and 20(b) of the Exchange Act by filing the Proxy Materials to garner votes in support of the Merger from FIN shareholders.

77.    Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Merger, Plaintiff and the other members of the Class were unable to make a fully-informed decision regarding whether to vote in favor of the Merger.

78.    The amendments to the AFIN Advisory Agreement were contingent upon the approval of the Merger by the shareholders of both RCA and AFIN. That approval was secured by the materially false and misleading Proxy Materials. In addition to violating Section 14, the defective Proxy Materials, their preparation and dissemination thereof, constituted a breach of the fiduciary duties undertaken by Advisor in the 2nd Advisory Agreement, as aided and abetted by AR Global, Schorsch and Kahane.

79.     The AFIN shareholder meeting and vote was held on February 13, 2017 and there

were present in person or by proxy stockholders holding an aggregate of 38, 431, 490 shares of

common stock only 58.4% of the total outstanding stock of 65,805,184 shares.  The merger was

approved by the best of majority:  33,523,321 votes for a 50.9% approval vote.

### THE ADVERSE EFFECTS UPON AFIN OF ADVISOR, AR GLOBAL, SCHORSCH AND KAHANE'S EXPLOITATION OF AFIN

80.     On June 9, 2017, AFIN's board implicitly acknowledged that AFIN had been

financially harmed by the merger by taking two actions:  (a) restricting the share repurchase

program to repurchase requests following death or "qualifying disability" of a shareholder but

their only for shares acquired through "non-cash purchases" and (b) reducing the amount paid in

distribution by over 20% from $1.65 per share to $1.30 per share.

81.     On March 17, 2017, approximately 20 business days after close of the Merger, the

Company's so-called independent directors unanimously approved a reduction in AFIN's

estimated per share net asset value equal from $24.17 to $23.37 as of December 16, 2016.

82.     The intangible damage to AFIN from increased risk to its operations from the

AFIN Advisory Agreement amendment is also profound:

- If AFIN terminates the Amended Advisory Agreement certain key employees of the AFIN Advisory may not become employees of AFIN which could result in AFIN incurring costs and degradation of its operations.

- The amendment has resulted in further limitation of AFIN's termination rights which precludes AFIN's from renegotiating terms of the agreement.

- The amendments to the Advisory Agreement including the approximately $125 million internalization fee will act as a poison pill to discourage a third party from making an offer for AFIN at a premium price thus allowing AR Global to appropriate for itself the control premium which belongs to AFIN.

- If in fact a third party does engage in a change of control transaction with AFIN, the amended Advisory Agreement will suppress the price an acquirer can pay and thus constitutes an unlawful transfer of value from AFIN to AR Global and affiliates.

- Continuation and the virtual permanence of the external management structure at AFIN will adversely affect AFIN's plans for a public listing and in any public listing the market value will likely reflect a discount for external management and a further discount due to the enormous internalization penalty.

83.     Finally, almost one year after closing of the merger, AFIN still has not been publicly listed.

## COUNT I

**(Against AFIN For Violations Of Section 14(a) Of The Exchange Act And Rule 14(a)-9 Promulgated Thereunder For False And Misleading Statements In Proxy Materials Issued Through February 9, 2017)**

84.     Plaintiff incorporates by reference and realleges each and every allegation contained set forth above, as though fully set forth herein.

85.     Section 14(a) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 781 of this title." 15 U.S.C. § 78n(a)(1).

86.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in proxy communications that contain "any statement which, at the time and in the light of the

circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

87.     AFIN issued the Proxy Materials with the intention of soliciting shareholder support for the Merger and 3rd Advisory Agreement.

88.     The Proxy Statements were defective and in violation of SEC Rule 14 and Rule 14a-9 because they contained untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. The stockholders vote was required for approval of the merger and amendment of the Advisory Agreement which was an essential causal link in the Merger and amendment of the Advisory Agreement.

89.     The misrepresentations and omissions in the Proxy Materials were material to Plaintiff and the Class, who were induced and solicited to vote in favor of the merger agreement and 3rd Advisory Agreement by defective Proxy Materials.

90.     As a direct and proximate result of issuing the defective Proxy Materials, Plaintiffs and other members of the Class have suffered damages in connection with the proposals being made in the Proxy relating to approving the Merger and 3rd Advisory Agreement.

## COUNT II

### (Against Advisor, AR Global, Schorsch And Kahane For Violations Of Section 20(a) Of The Exchange Act)

91.     Plaintiff incorporates by reference and realleges each and every allegation contained set forth above, as though fully set forth herein.

92.     The Advisor, AR Global, Schorsch and Kahane ("Controlling Defendants") acted as controlling persons of AFIN within the meaning of Section 20(a) of the Exchange Act as

alleged herein.  By virtue of their positions and due to their participation in and/or control of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy Materials filed with the SEC, had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the Proxy Materials that Plaintiff contends are materially incomplete and misleading.

93.     The Controlling Defendants were provided with or had unlimited access to copies of the Proxy Materials and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

94.     In particular, the Controlling Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.

95.     By virtue of the foregoing, Controlling Defendants have violated Section 20(a).

96.     As a direct and proximate result of issuing the defective Proxy Materials, Plaintiffs and other members of the Class have suffered damages in connection with the proposals being made in the Proxy relating to approving the Merger and 3rd Advisory Agreement.

## COUNT III

### Against The Advisor For Breach Of Fiduciary Duties

97.     Plaintiff incorporates by reference and realleges each and every allegation contained set forth above, as though fully set forth herein.

98.     As alleged in detail herein, under the Advisory Agreements, Advisor assumed fiduciary duties to AFIN stockholders to, among other things, act in furtherance of the best interests of the Company and its shareholders so as to benefit all stockholders equally and not in furtherance of AFIN's personal interest or benefit.

99.     The Advisor breached its fiduciary duties by insisting on amendments of the AFIN Advisory Agreement that destroyed AFIN shareholder value; impeded a public listing at fair value; and misappropriated AFIN value from shareholders to AR Global.

100.    The Advisor also breached its fiduciary duties to AFIN shareholders in 2015 when it disseminated a defective Proxy Statement soliciting a vote for approval of Charter changes which included an amendment to the Advisory Agreement to include, *inter alia*, a 20 year non-cancellable term.

101.    As a direct and proximate result of the Advisor's breaches of fiduciary duties, AFIN shareholders have sustained substantial damages.

## COUNT IV

### Against AR Global, Schorsch And Kahane For
### Aiding And Abetting AFIN Breach Of Fiduciary Duties

102.    Plaintiff incorporates by reference and realleges each and every allegation contained set forth above, as though fully set forth herein.

103.    Each of the Defendants knowingly participated in breaches of fiduciary duty by AFIN and thus are liable for aiding and abetting AFIN's fiduciary breaches.

104.    As a direct and proximate result of the Advisor's breaches of fiduciary duties, AFIN shareholders have sustained substantial damages.

## COUNT V

### Against Defendants' AR Global, Schorsch, Kahane And Advisor
### For Violation Of SEC 20(b) Of The Exchange Act (15 U.S.C. 78t)

105.    Plaintiff incorporates by reference and realleges each and every allegation

contained set forth above, as though fully set forth herein.

106.    Section 20(b) of the Exchange Act provides as follows:

> It shall be unlawful for any person, directly or indirectly to do any
> act or thing which it would be unlawful for such person to do
> under provisions of the chapter on any rule or regulation
> thereunder through or by means of any other person.

107.    Section 20(b) imposes primary liability on violators.

108.    By virtue of their control and active engagement in the authorship and

dissemination of the defective Proxy Materials the Defendants named herein acted through

AFIN.

109.    Defendants Advisors, AR Global, Schorsch and AR Global thus violated Section

14(a)-9 of the Exchange Act through AFIN and were therefore liable under Section 20(b).

110.    As a direct and proximate result of issuing the defective Proxy Materials,

Plaintiffs and other members of the Class have suffered damages in connection with the

proposals being made in the Proxy relating to approving the Merger and 3rd Advisory

Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.    Awarding the shareholders the amount of damages sustained as a result of AFIN's

breaches of fiduciary duties and Defendants AR Global, Schorsch and Kahane's aiding and

abetting of those breaches of fiduciary duty;

B.      Compelling AFIN and Advisor to rescind 3rd Advisory Agreement and 2nd

Advisory Agreement and to have Advisor disgorge the benefits received as a result;

C.      Declaring void the non-cancellable terms and 20 year term of the 3rd Advisory

Agreement and the internalization fee;

D.      Awarding to Plaintiffs the costs and disbursements of this action, including

reasonable attorneys' and experts' fees and expenses;

E.      Awarding Plaintiff and the class damages from Defendants' Section 14 violations;

and

F.      Granting such other and further relief as the Court deems just and proper.

Dated: February 8, 2018

SQUITIERI & FEARON, LLP


By:_____

Olimpio Lee Squitieri
32 East 57th Street
12th Floor
New York, New York 10022
Tel:  (212) 421-6492
Fax:  (212) 421-6553